**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF GUAM**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Criminal Case No. 09-00026 |
| Plaintiff, | |
| vs. | **ORDER RE: MOTION TO SUPPRESS** |
| **HENRY JOSEPH SALAS** | |
| and | |
| **EDDIE PABLO PAULINO,** | |
| Defendants. | |

Defendants Henry Joseph Salas and Eddie Pablo Paulino ("Defendants," together) seek an order suppressing evidence obtained as a result of searches conducted on November 22, 2008. *See* Docket Nos. 22, 27, 30, 32, 36, 41, 43. There are three searches at issue: (1) a search constituted by the Government's monitoring of signals emitted by a beeper installed in a package pursuant to a beeper warrant; (2) a search incident to a warrantless entry of Defendant Paulino's home, which the Government defends on a theory of exigent circumstances; and (3) a search incident to a later warrantless entry of Defendant Paulino's home, which the Government defends on a theory of consent. Having reviewed Defendants' motion, the supporting and opposing memoranda, the testimony of witnesses at the suppression hearing, and the arguments of counsel, the court hereby **GRANTS** the motion as to the evidence obtained via the search defended on the consent theory, but **DENIES** the motion in all other respects.

## I. FINDINGS OF FACT

On November 20, 2008, a drug-detector dog alerted to an express mail package sent by Mark Castro and addressed to "Ba Ba Salas" at P.O. Box 1571 in Hagåtña, Guam. Postal records indicated that the post office box had been taken out by Henry C. Salas, and that Defendant Henry J. Salas was an authorized recipient on the box.

On November 21, 2008, law enforcement officers obtained a warrant to search the package. Upon opening and searching the package, they discovered about 109.5 grams of 91.1% pure methamphetamine hydrochloride. This amount of methamphetamine has a street value of about $80,000.

Law enforcement officers then applied for, and received, a warrant allowing them to install and monitor a beeper/breach-detection device in the package.[1] *See* Docket No. 32, Exhibits A (application for warrant) & B (warrant). This device would immediately alert the officers once the package had been opened. Then, having obtained the warrant, they sprayed the envelope with "clue spray," removed the methamphetamine and replaced it with sham, installed the beeper, re-sealed the package, and made a controlled delivery to P.O. Box 1571 in Hagåtña, Guam.

At 5:22 a.m. on November 22, 2008, the officers met to go over their strategy for the operation. They planned to observe P.O. Box 1571 and follow whoever retrieved the package back to that person's residence. Then, according to the testimony of Officer Eugene McDonald, the officers planned to enter the residence once the beeper indicated that the package had been opened, so as to secure the residence and secure the evidence. At that time, the officers believed that the package would be taken to the residence of Defendant Salas, since he was thought to be

---

[1] The officers also applied for an anticipatory search warrant. See Docket No. 22 at 2:3-17. However, in the face of Defendants' challenge to that warrant, the Government has stated that "[it] agrees with the Defense that the provision of the anticipatory search warrant providing for the search of any location the parcel may be transported to is invalid." Docket No. 35 at 3:4-5. Thus, the anticipatory search warrant is not discussed.
  The court is troubled that the anticipatory search warrant was drafted and approved as it was. While recognizing that the Government properly chose not to defend the anticipatory search warrant, the court believes that further training in drafting and reviewing search warrants is in order. This issue must be brought to the attention of United States Attorney.

"Ba Ba Salas"—*i.e.*, the intended recipient of the package.

The officers made their controlled delivery of the package early in the morning of November 22, 2008. Later that morning, Geraldine "Gina" Mendiola picked the package up. Mendiola then drove to Shirley's Coffee Shop in Hagåtña, where Defendants Henry Salas and Eddie Paulino were waiting. She gave the package to Defendant Salas. Having obtained the package, Defendants Salas and Paulino left the coffee shop. Defendant Paulino carried the package out.

Defendants Salas and Paulino then got into separate vehicles and drove to Defendant Paulino's house in Ipan-Talofofo. The officers who were tailing them did not know where they were going, as, again, they believed that the package would be taken to the residence of Defendant Salas—Defendant Paulino had not been implicated in the investigation.

The officers tailed Defendants from several different vehicles. While the entirety of the officers' vehicles maintained contact with Defendants' vehicles, no one police vehicle kept both Defendants' vehicles in view the entire time. The officers followed Defendants to a dead-end street in Ipan-Talofofo. The officers parked along the street while Defendants continued up a driveway. The officers could not see, from their position on the road, the house that Defendants went into, if any, because trees obscured their view. The officers had been parked on the road for about 2 to 5 minutes when the beeper-monitoring team advised them that the package had been opened, and that the place where it had been opened was in the direction up the driveway.

Officer McDonald—who had taken part in at least 20 similar operations and is certified in the use of beeper/breach-detection devices—testified that, in his experience, suspects who open a package containing a beeper device will see the beeper, infer that they are under police surveillance, and then try to destroy whatever evidence may be in the package. He also testified that while the beepers are (in his experience) 100% accurate in indicating when a package has been opened, they do not give very detailed information as to their location, and that their signal range "depends on the terrain."

Having detected the breach, the officers went up the driveway that Defendants had gone

up a few minutes before, and saw Defendants' vehicles parked outside of what proved to be Defendant Paulino's house. The officers then forcibly entered Defendant Paulino's house. There is a dispute about whether the officers knocked and announced their presence and authority prior to their forced entry. As they entered, they saw Defendant Paulino coming out of the bathroom and heard the sound of the toilet flushing. However, they did not hear anything from inside the home *before* they entered the home. They also saw the express mail envelope lying on the living room couch, and the beeper/breach-detection device lying on the floor of the bathroom that Defendant Paulino had just left. Having determined that Defendants Salas and Paulino were the only people in the house at the time, the officers escorted them outside and secured the premises.

Once they were all outside, the officers asked Defendant Paulino for permission to search the house. According to the Government, Defendant Paulino responded with something like: "No, this is not my house—it's my mom's, so you'll have to ask her." However, Defendants deny that Defendant Paulino disclaimed having authority to grant or deny permission to search the house. At any rate, one of the officers then present, Raymond Joseph Blas, knows Defendant Paulino's mother, Flora Paulino, and decided to call her to ask for her permission to search the house. According to the Government, when Officer Blas called her,

> Flora Paulino granted consent to search the house contingent on Officer Blas being present during the search. [Defendant] Paulino was present during the phone conversation. When asked, [Defendant] Paulino explicitly denied having any authority to consent or deny consent to search the house. When consent was granted to [the] Officers by Flora Paulino in Eddie Paulino's presence[,] he did not then make any claim of authority.

The house was then searched pursuant to Flora Paulino's instructions.

Defendant Paulino and his mother strongly dispute this account of the facts. Significantly, Ms. Paulino declares that she has lived in Virginia since 2006, that she never gave consent, and that her son "has exclusive use and sole access and control to the residence."

In his testimony, Officer Blas stated that he knew that Ms. Paulino lived in the continental United States, as he had visited her and her family on the East Coast in recent years. He also

Page 4 of 18

1  stated that he was under the impression that Ms. Paulino and her family had been living on the
2  East Coast for a few years.  Finally, he stated that he saw Defendant Paulino's personal effects
3  throughout the house, such that it was clear that Defendant Paulino lived there.

4  During the search, the officers used a "black light" on the bathroom fixtures and thereby
5  discovered clue spray residue on the toilet seat, toilet handle, faucet handles, and soap dispenser.
6  The officers also observed that Defendant Paulino had clue spray residue on his hands.
7  However, the sham that had been put in place of the real methamphetamine was never found.

## II. PROCEDURAL HISTORY

The indictment was filed on May 13, 2009.  *See* Docket No. 1.  The one-count indictment charges Defendants Henry Joseph Salas and Eddie Pablo Paulino with Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & 846.  *See id*.  Defendants initially appeared and entered pleas of not guilty on May 14, 2009.  *See* Docket No. 7.

On June 26, 2009, Defendant Paulino filed his Motion to Suppress.  *See* Docket No. 22.  The Government opposed Defendant Paulino's motion on July 2, 2009.  *See* Docket No. 26.  On July 6, 2006, Defendant Paulino filed an Amended Motion to Suppress.  *See* Docket No. 27.

On July 10, 2009, the court granted a stipulated Motion to Continue Trial and Extend Deadlines that the parties had filed on June 29, 2009.  *See* Docket No. 28.  That order extended Defendants' pre-trial motions deadline from June 26 to July 15, 2009.  *See id*. at 1:20-21.  Accordingly, it also changed the Government's deadline for opposing those motions from July 3 to July 22, 2009, and it changed the Defendants' reply deadline from July 10 to July 29, 2009.  *See id*. at 1:22-23.

On July 14, 2009, Defendant Salas joined in Defendant Paulino's Motion to Suppress.  *See* Docket No. 30.

On July 17, 2009, Defendants filed a Supplemental Amended Motion to Suppress.  *See* Docket No. 32.  The Government opposed this motion on July 24, 2009.  *See* Docket No 35.  Defendants replied to the Government's opposition on July 29, 2009.  *See* Docket No. 36.

On July 30, 2009, Government filed a Supplemental Response to Defendants' Amended

Motion to Suppress. *See* Docket No. 38. The Government did not indicate why it did not combine this filing with its July 24 filing.

On September 2, 2009, Defendants filed Supplemental Replies to Remaining Motion Issues. *See* Docket No. 41. This document makes reference to an attached "Declaration of Flora Paulino." *See id*. at 2:1-2. However, no such declaration was attached. Defendants filed the Declaration of Flora Paulino the following day—September 3, 2009. *See* Docket No. 43.

Finally, on July 24, 2009, Defendant Salas moved for severance. *See* Docket No. 33. The Government opposed this motion on July 30, 2009. *See* Docket No. 37. However, on August 14, 2009, Defendant Salas asked that the court hold his motion for severance in abeyance pending resolution of the Motion to Suppress. *See* Docket No. 39. On August 17, 2009, the court granted Defendant Salas' request to hold his motion in abeyance. *See* Docket No. 40.

### III. ANALYSIS

The court now turns to the evidence Defendants seek to suppress.

#### A. Evidence Obtained via Execution of Beeper Warrant

First, Defendants seek suppression of all evidence derived from execution of the beeper warrant. *See* Docket No. 32 at 5:8-16; Docket No. 36 at 2:9-5:15. The Fourth Amendment requires that a warrant describe with "particular[ity] . . . the place to be searched and the persons or things to be seized."[2] U.S. CONST. amend. IV; *see also* FED. R. CRIM. P 4(b)(1) & 41(e)(2). Defendants argue that suppression is proper because the beeper warrant "lacked particularity," and was therefore invalid. Docket No. 32 at 5:8-9.

A warrant authorizing beeper installation and surveillance may issue on three pieces of information: (1) "the object into which the beeper is to be placed," (2) "the circumstances that led agents to wish to install the beeper;" and (3) "the length of time for which beeper surveillance is requested." *United States v. Karo*, 468 U.S. 705, 718 (1984).

---

[2] This limitation is designed to protect the individual's privacy interests against "the wide-ranging exploratory searches the Framers [of the Constitution] intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

Page 6 of 18

The court finds that all three elements are satisfied. Both the application for the beeper warrant and the warrant itself clearly describe "the object into which the beeper is to be placed." *See generally* Docket No. 32, Exhibits A (application for warrant) and B (warrant). The affidavit of Roseanna T. Castro that is attached to the application for the beeper warrant describes "the circumstances that led agents to wish to install the beeper." *See id.*, Exhibit A, ¶15 *et seq.* As to "the length of time for which beeper surveillance is requested," the application for the warrant and the affidavit of Officer Castro are silent, but the warrant itself clearly states that it would be valid "**for a period of forty-eight (48) hours from the time of delivery** of the subject parcel to the said premises or other location." *Id.*, Exhibit B (emphasis in original). If any problem may be said to arise from the fact that both the application for the warrant and the supporting affidavit are silent on "the length of time for which beeper surveillance is requested," the problem is resolved by the warrant's forty-eight-hour time limit: it limits the scope of permissible police action in a clear and definite manner, thereby serving classical search warrant purposes. *See, e.g., Steagald v. United States*, 451 U.S. 204, 213 (1981) (purpose of warrant is to safeguard individual privacy interests against unjustified police intrusion); *Stanford v. Texas*, 379 U.S. 476, 485 (1965) (purpose of warrant is to minimize or eliminate discretion of officer executing it). Thus, all three *Karo* elements are satisfied, and so the beeper warrant is valid.

Defendants argue that this application of *Karo* "is not correct," in that it suggests "that [the particularity requirement] is somehow excused if the Government describes the object in to which the beeper will be placed, the circumstances that led agents to wish to install the beeper, and the length of time for which the beeper surveillance is requested." Docket No. 36 at 5:8-11.

Defendants are wrong. *Karo* does not suggest that the particularity requirement "is somehow excused" by a showing of the three elements; rather, it states that the requirement is positively *satisfied* thereby. Here is the relevant language:

> We are also unpersuaded by the argument that a warrant should not be required because of *the difficulty in satisfying the particularity requirement of the Fourth Amendment*. The Government contends that it would be impossible to describe the "place" to be searched, because the location of the place is precisely what is sought to be

> discovered through the search. However true that may be, it will still be possible to describe the object into which the beeper is to be placed, the circumstances that led agents to wish to install the beeper, and the length of time for which beeper surveillance is requested. In our view, *this information will suffice* to permit issuance of a warrant authorizing beeper installation and surveillance.

*Karo*, 468 U.S. at 718 (citation omitted; emphasis added). The phrase "this information will suffice" must be understood in relation to the clause at the end of the first sentence: "the difficulty in satisfying the particularity requirement of the Fourth Amendment." The *Karo* Court is saying that "this information" (*i.e.*, object, circumstances, and length of time) "will suffice" to overcome "the [Government's perceived] difficulty in satisfying the particularity requirement of the Fourth Amendment." Put differently, in response to the Government's argument that beeper surveillance should not require a warrant because the Government, in practice, would not be able to describe with particularity the physical location to be monitored pursuant to such a warrant, the *Karo* Court stated that there are ways to satisfy the Fourth Amendment's particularity requirement that do not require a description of the physical location to be monitored. *See also United States v. Petti*, 973 F.2d 1441, 1444-45 (9th Cir. 1992) (stating that a beeper warrant "may comply with the particularity requirement even though it does not specify the physical location of the place to be surveilled" and that "[t]he [*Karo*] Court noted that the officers could satisfy the purposes of the particularity requirement by providing other information"). Thus, *Karo*'s holding is indeed "that the Government can obtain a warrant authorizing the monitoring of any place a package is transported [to] and opened [in]." Docket No. 36 at 5:11-15. Defendants are wrong.[3]

In sum, the beeper warrant is valid, so the evidence obtained as a direct result of its execution—namely, the knowledge that the package had been opened—is admissible.

---

[3] In fact, common sense shows that Defendants are wrong. If, as a condition of validity, beeper warrants *were* required to identify the location to be monitored via beeper signals, then criminal actors could invalidate any beeper warrant by taking any package to a random location and then arguing that the warrant was insufficient because the location monitored via the beeper signals was not the location identified in the warrant. Beepers would then be useless as a law enforcement tool.

**B.     Evidence Obtained via Entry Into Home**

Defendants next wish to suppress all evidence derived from entry into the house. *See* Docket No. 27 at 5:5-6:9. There were two such entries. Defendants emphasize the (undisputed) fact that both were "warrantless." The Government defends the first entry on a theory of exigent circumstances, and the second on a theory of actual consent.[4]

**1.     Exigent Circumstances Theory**

The Government defends its first warrantless entry on a theory of exigent circumstances.

A warrantless entry and search of a home is *per se* illegal unless justifiable on an exception to the Fourth Amendment's warrant requirement. *See United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is furnished by the "exigent circumstances" doctrine. *See id*. This doctrine is triggered "when 'police officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons.'" *Id*. (quoting *United States v. Kunkler*, 679, F.2d 187, 191-92 (9th Cir. 1982)).

"The [G]overnment bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances." *Id*. (citing *LaLonde v. County of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000)). The Government must also show that a warrant could not have been obtained in time. *See United States v. Howard*, 828 F.2d 552, 554 (9th Cir. 1987). "Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Davis*, 530 F.3d 1069, 1085 (9th Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause requires only a fair probability or substantial chance of criminal activity . . . ." *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002). Probable cause determinations

---

[4] The Government admits that "[a]fter clearing the residence and escorting the occupants outside the building[,] the exigent circumstances justifying the initial entry were exhausted." Docket No. 26 at 3:13-15. *Cf. Mincey v. Arizona*, 437 U.S. 385, 393 (1978). As to the knock-and-announce issue, see the following note.

may be based in part on reasonable inferences. *See United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006) (*en banc*).

Thus, to justify a warrantless entry on an exigent circumstances theory tied to the destruction of evidence, the Government must present specific and articulable facts showing that, on the totality of the circumstances, (1) there was a fair probability that the package was in Defendant Paulino's house, (2) the officers did not have time to obtain a warrant, (3) the officers reasonably believed that the package and its contents were in danger of imminent destruction, and (4) the officers acted on that belief in good faith by entering the premises so as to protect the evidence from destruction.

The court finds that all these elements are established. First, there was a fair probability that the package was in Defendant Paulino's house, because the officers saw Defendant Paulino carry the package out of Shirley's; followed him and Defendant Salas to a driveway in Ipan-Talofofo; and entered the house at the top of the driveway—the house that had Defendants' cars parked in front of it. *See Alaimalo*, 313 F.3d at 1193 (there was fair probability that the package was in the house because the officers had seen the suspect pick package up, had followed him to a dead-end street, and the only house on that street showing signs of activity had the suspect's car parked in front of it). Relatedly, it was reasonable to believe that the package had *not* been left in either of Defendants' cars, given that the package was thought to contain drugs worth about $80,000. *See id*. (unlikely that drugs would have been dropped off and left unattended in the jungle or suspect's car). Second, the agents did not have time to obtain a warrant. The officers had thought that the package would be taken to Defendant Salas' residence, and had not suspected Defendant Paulino's involvement in the activity, and so had not anticipated following the package to Defendant Paulino's house. They had only been parked on the street near Defendant Paulino's house for about 2 to 5 minutes when the beeper-monitoring team advised them that the package had been opened. Officer McDonald testified that, in his experience, suspects who open a package containing a beeper device will see the beeper, infer that they are under police surveillance, and then try to destroy whatever evidence may be in the package.

Officer McDonald also testified that, in his experience, the beepers are 100% accurate in indicating when a package has been opened—that is, they do not give false positives. Thus, once the beeper went off, it was reasonable for the officers to believe that the package had in fact been opened, meaning that they had they had very little time to secure the evidence, and, consequently, no time to obtain a warrant. That analysis also establishes the third element, which is that the officers reasonably believed that the package and its contents were in danger of imminent destruction. Fourth and last, the officers acted on their belief in good faith: once they secured the evidence and the premises, they went outside and sought Defendant Paulino's consent to search his home, implicitly recognizing that their authority to enter the house lapsed with the risk of evidence destruction. Therefore, all elements are established, so the first warrantless entry is justified on a theory of exigent circumstances tied to the destruction of evidence.

The court notes other federal courts have held, on very similar facts, that exigent circumstances (tied to the destruction of evidence) justifying a warrantless entry arise when a beeper/breach-detection device—placed by authorities in a package containing contraband—goes off, indicating to authorities that the package has been opened and that the evidence is in danger of destruction. For example, in *United States v. McGregor*, 21 F.3d 1067 (11th Cir. 1994), the court confronted these facts: a package containing contraband (cocaine) had been intercepted; a beeper was lawfully installed, to enable officers to keep track of the package; a controlled delivery was executed; the beeper went off, and the officers, deciding that they did not have enough time to obtain a warrant, entered the defendant's home immediately thereafter, to prevent the defendant from destroying the contraband or other evidence. *See id*. at 1068. The district court denied the defendant's motion to suppress (which the defendant had argued on the "created exigencies" doctrine), and the Eleventh Circuit affirmed. *See id*. at 1070. The *McGregor* court first noted that "[t]he risk of removal or destruction of narcotics is a 'particularly compelling' exigent circumstance." *Id*. at 1069 (quoting *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990), *cert. denied*, 502 U.S. 825 (1991)). Then, it reasoned as follows:

> In this case, inspectors placed a beeper inside a package of

Page 11 of 18

Case 1:09-cr-00026  Document 46  Filed 10/02/09  Page 11 of 18

> cocaine before completing a controlled delivery. Almost six hours
> after delivery, the beeper sounded, indicating the box had been
> opened. At this point, the officers monitoring the beeper
> reasonably believed defendant, to whom the package had been
> delivered, would discover the beeper and realize he was being
> watched. And, the officers reasonably perceived that, if they did
> not move immediately, McGregor might destroy the cocaine. So,
> exigent circumstances were present in this case at the time the
> beeper sounded.

*Id*. Finally, in rejecting the defendant's "created exigencies" argument, the McGregor court pointed out that

> a beeper was used because the identity of the ultimate holders of
> the cocaine and the place where the box would be opened were the
> focus of the inspectors' interest; and these persons and that place
> were not yet known. For example, it was entirely possible that
> McGregor would not open the package, but would instead deliver
> it to another place and other persons the next day. If that
> happened, any warrant the inspectors obtained for McGregor or his
> home would have been worthless, and the police and judicial
> resources invested in the warrant process would have been wasted.

*Id*. *See also United States v. Martinez*, 264 F. Supp. 2d 298, 301-04 (D. Md. 2003) (following *McGregor* in denying motion to suppress on similar facts); *United States v. Jeffries*, 823 F. Supp. 437, 441-42 (E.D. Mich. 1993), *aff'd*, 39 F.3d 1182 (6th Cir. 1994) (holding that beeper signal indicating that package under surveillance had been opened created exigent circumstances justifying noncompliance with knock-and-announce rule). *Cf. United States v. Johnson*, 12 F.3d 760 (8th Cir. 1994) (holding that placement of beeper in package under surveillance triggers "created exigencies" doctrine, though only in context of finding that officers had enough time to obtain a warrant and it was ultimately harmless error).

The court is not persuaded by Defendants' arguments against the exigent circumstances theory. First, Defendants emphasized Officer McDonald's admissions, on cross-examination, that the beepers do not give very detailed information as to their location, and that their signal range "depends on the terrain." But such facts could only go to the question whether the officers had probable cause to believe that the package was in Defendant Paulino's house, and, as shown above, the court's analysis of that question does not somehow require that the beeper have

provided accurate, detailed location information. Rather, under *Alaimalo*, it is enough that the officers saw Defendant Paulino carry the package out of Shirley's; followed him and Defendant Salas to a driveway in Ipan-Talofofo; and entered the house at the top of the driveway—the house that had Defendants' cars parked in front of it. *See Alaimalo*, 313 F.3d at 1193. What *was* important to the court's analysis was that beepers accurately indicate when breach has occurred, as it is this information that created the exigency. And, again, Officer McDonald testified that the beepers are (in his experience) 100% accurate in this regard.

Defendants also argue that exigent circumstances could not have existed because neither contraband nor evidence was subject to imminent destruction. *See, e.g.*, Docket No. 36 at 6:5-13. This argument is frivolous. While it is true that the package contained no contraband, the package and its contents still constitute *evidence*, as Defendants themselves make perfectly clear—if the package and its contents were *not* evidence, Defendants presumably would not strive so mightily to have that non-evidence suppressed. Defendants cannot consistently argue that the package and its contents are not evidence, and yet must be suppressed.

In sum, exigent circumstances supported the first warrantless entry. Thus, the evidence obtained as a result of that entry is admissible.[5] This evidence includes the facts that the officers saw Defendant Paulino coming out of the bathroom, heard the sound of the toilet flushing, saw the express mail envelope lying on the living room couch, and saw the beeper/breach-detection device lying on the floor of the bathroom that Defendant Paulino had just left. It *does not* include the evidence relating to the discovered clue spray residue, nor the fact that the officers were unable to find the sham methamphetamine.

---

[5] This disposes of the knock-and-announce issue. Under the "knock-and-announce rule", 18 U.S.C. § 3109, officers may forcibly enter the premises to execute a search warrant *only* after knocking and announcing their authority and purpose. However, the knock-and-announce requirement does *not* apply when officers are faced with exigent circumstances supporting "a *reasonable suspicion* that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, *or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.*" *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997) (emphasis added). "Reasonable suspicion is a less demanding standard than probable cause . . . ." *Alabama v. White*, 496 U.S. 325, 329 (1990). Thus, because the facts support probable cause justifying a warrantless entry on an exigent circumstances theory, they *a fortiori* support the "reasonable suspicion" needed to justify noncompliance with the knock-and-announce rule.

### 3. Consent Theory

The Government defends its second warrantless entry on a theory of consent.

Although the Fourth Amendment prohibits only unreasonable searches, *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990), it "incorporates a strong preference for search warrants." *United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992). Still, a consensual warrantless search is reasonable when the consent-giver has authority over the area searched. *See United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974). Where the validity of a search rests on consent, the Government has the burden of proving that the necessary consent was obtained. *See Florida v. Royer*, 460 U.S. 491, 497 (1982) (plurality opinion).

With regard to the "authority" of the consent giver, there are two types: actual and apparent. The foundation of *actual* authority is "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7.

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority [that] justifies the third-party consent does *not* rest upon the law of property, with its attendant historical and legal refinements, but rests rather on *mutual use* of the property by *persons generally having joint access or control* for most purposes, so that it is reasonable to recognize that any of the *co-inhabitants* has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the *common area* to be searched.

*Id*. (emphasis added) (citing *Stoner v. California*, 376 U.S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room); *Chapman v. United States*, 365 U.S. 610 (1961) (landlord could not validly consent to the search of a house he had rented to another)). *See also United States v. Murphy*, 516 F.3d 1117, 1122 (9th Cir. 2008) (explicating *Rodriguez* and *Matlock*). In short, to have actual authority, a person must have "mutual use of the property" and "joint access or control for most purposes."

When the facts do not support a finding of actual authority, a search is reasonable if the consent-giver had *apparent* authority. *Rodriguez*, 497 U.S. at 188. Apparent authority exists when: (1) the officer believed "some untrue fact that was then used to assess the extent of the

Page 14 of 18

consent-giver's use of and access to or control over the area searched;" (2) it was objectively reasonable under the circumstances to believe that the fact was true; and (3) "assuming the truth of the reasonably believed but untrue fact," the consent-giver would have had actual authority. *United States v. Ruiz*, 428 F.3d 877, 880-81 (9th Cir. 2005) (citation omitted). "Apparent authority is *measured by an objective standard of reasonableness*, and requires an examination of the actual consent as well as the surrounding circumstances." *Id*. at 881 (emphasis added; citation omitted). "Even when the invitation [to search] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Rodriguez*, 497 U.S. at 188; *see also Georgia v. Randolph*, 547 U.S. 103, 114-123 (2006) (warrantless search of a shared dwelling for evidence, over the express refusal of consent by a physically present resident, cannot be justified as reasonable on the basis of consent given to police by another resident). The issue is whether "the facts available to the officer at the moment [of entry] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Id*. at 182 (citation and quotation omitted). And since "authority over the premises" is, for Fourth Amendment purposes, a matter of "mutual use of the property" and "joint access or control for most purposes," another way to state the issue is whether the facts available to the officer at the moment of entry allowed for a reasonable belief that the consenting party had "mutual use of the property" and "joint access or control for most purposes."

Importantly, the apparent authority doctrine applies *only* to reasonable mistakes of fact, *not* to mistakes of law. *Ruiz*, 428 F.3d at 881.

Finally, any consent search—whether predicated on actual or apparent authority—must also be voluntary. "Voluntariness is a question of fact to be determined from all the surrounding circumstances. When viewing the surrounding circumstances, there is no single controlling criterion." *United States v. Perez-Lopez*, 348 F.3d 839, 846 (9th Cir. 2003). The list of relevant criteria includes, but is not limited to, "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether

Page 15 of 18

Case 1:09-cr-00026   Document 46   Filed 10/02/09   Page 15 of 18

the defendant was told he had the right not to consent; and (5) whether the defendant was told that a search warrant could be obtained." *Id.* (citing *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000)). *See also United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 n. 3 (9th Cir.1997) ("Although the presence or absence of one of these factors is not dispositive of the voluntariness inquiry in any given case, many of this court's decisions upholding consent as voluntary are supported by at least several of the factors.").

Thus, to justify a warrantless entry on a theory of consent, the Government must prove that (1) it obtained consent from a person to search the premises; (2) the person had actual or apparent authority; and (3) the person gave consent voluntarily. If the Government tries to establish consent based on apparent authority, the "untrue fact" that the searching officer believed must truly be a *fact*, rather than a proposition of law.

Without resolving the factual dispute about exactly what Flora Paulino said, the court finds that the second element is not established because, *even on the Government's version of the facts*, Flora Paulino had neither actual nor apparent authority to consent to the search of Defendant Paulino's home. She did not have *actual* authority because she has resided in Virginia since 2006. *See* Docket No. 43 at ¶2.[6] Therefore, she lacked (and still lacks) "mutual use of the property [and] joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7. Actual authority is a function of using and occupying the property, and she neither uses nor occupies the property.

Similarly, Flora Paulino did have not *apparent* authority to consent to the search of Defendant Paulino's home. Officer Blas—the officer who obtained consent—stated that he knew that Ms. Paulino lived in the continental United States, that he was under the impression that Ms. Paulino and her family had been living there for a few years, that he had visited her and her family on the East Coast in recent years, and that he saw Defendant Paulino's personal effects throughout the home. Thus, Officer Blas could not have had a *reasonable* belief that Ms.

---

[6] The court notes that the Government did not object to the admission of the Declaration of Flora Paulino.

Page 16 of 18

Paulino, the consenting party, had "mutual use of the property" and "joint access or control for most purposes"—he knew, as a matter of fact, that Ms. Paulino had not lived there for years, and therefore could not have believed that Ms. Paulino had such mutual use or access or control. Since apparent authority requires a reasonable belief that the consent-giver *had* such use or access or control, and Officer Blas could not have had such reasonable belief, Ms. Paulino did not have apparent authority to consent to the search of Defendant Paulino's home.[7]

Cases support this result. When a person consents to a police search of a home she owns but does not live in, and she happens to be the mother of the tenant, the situation is like a straightforward landlord-tenant relationship, and it is immaterial, for Fourth Amendment purposes, that the "landlord" happens to be the parent of the "tenant." *See* Wayne R. LaFave, 4 SEARCH & SEIZURE § 8.4 n.40 (citing *Fields v. State*, 808 P.2d 79 (Okl. Crim. App. 1991)). In *Fields*, the defendant and his mother—who consented to search of the house—owned it jointly, but defendant was living there with friends rent-free, on the understanding he was to do some repairs, while the mother lived elsewhere. *Fields*, 808 P.2d at 80. The court held defendant's mother "did not have the authority to authorize the search," for she lacked "joint access and control" because she "did not pay the bills, did not possess a key and did not keep any of her property in the house other than the stove," and thus "her relationship would be most similar to that of landlord over her interest in the property." *Id*. at 81. *See also State v. McLees*, 994 P.2d 683 (Mont. 2000) (where defendant staying in apartment of his father, owned by defendant's grandfather who lived in residence nearby, and father paid grandfather no rent, and grandfather "did not have free access" and "did not share in its use," grandfather could not consent to search of apartment, as he lacked "common authority"); *State v. Zimmerman*, 529 N.W.2d 171 (N.D. 1995) (where defendant lived in a trailer on farm a quarter mile from the farmhouse, where defendant's parents resided, but father had deeded all of farm but farmhouse to son, and father no

---

[7] Officer Blas appears to have thought that Ms. Paulino had authority to consent to the search because she owns the property. While this is an understandable mistake, it is a mistake of law, and the apparent authority doctrine does not allow for such mistakes. *Ruiz*, 428 F.3d at 881.

Case 1:09-cr-00026 Document 46 Filed 10/02/09 Page 17 of 18

longer involved in dairy operation and derived no income from it, father lacked common authority over milking parlor 50 yards from farmhouse).

In sum, there is no consent to support the second warrantless entry. Thus, the evidence obtained as a result of that entry is not admissible. That is, neither the evidence relating to the discovered clue spray residue nor the fact that the officers were unable to find the sham methamphetamine is admissible.

## IV. CONCLUSION

For the foregoing reasons, the court **GRANTS** Defendants' motion as to the evidence obtained via the search defended on the consent theory, but **DENIES** the motion in all other respects. Thus, the evidence obtained as a result of that entry is not admissible. That is, neither the evidence relating to the discovered clue spray residue nor the fact that the officers were unable to find the sham methamphetamine is admissible. Conversely, all other evidence at issue in the motion to suppress is admissible.

Defendant Salas has yet to reply to the Government's opposition to his Motion for Severance. Accordingly, Defendant Salas shall file his reply on or before October 16, 2009. The court shall hear argument on the Motion for Severance at 9:30 a.m. on Wednesday, November 25, 2009.

**SO ORDERED**.



/s/ Frances M. Tydingco-Gatewood
    Chief Judge
Dated: Oct 02, 2009